# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | | |
|---|---|---|
| SHAULA LANEAR ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 7:17-cv-00831-TMP |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Deputy Commissioner for* | ) | |
| *Operations of the Social Security* | ) | |
| *Administration*, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

The plaintiff, Shaula Lanear Allen, individually and as representative payee and on behalf of J.L.,[1] appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") finding that she and J.L. received an overpayment based upon J.L.'s available resources and denying her and J.L.'s requests for a waiver of the overpayment of Supplemental Security Income ("SSI") benefits.  Ms. Allen timely pursued and exhausted her and J.L.'s administrative remedies, and the decision of the Commissioner is ripe for review pursuant to 42

---

[1] J.L. is the plaintiff's disabled son born on January 19, 1999.  (Tr. at 279, 379-80).  Since the filing of the complaint in the above-styled action, J.L. has reached the age of majority in the State of Alabama.  However, at the time of the filing of the complaint and at all relevant times during the administrative proceedings below, J.L. was a minor child.  Accordingly, the court will continue to refer to J.L. by his initials.

U.S.C. §§ 405(g), 1383(c)(3).[2]  The parties have consented to the exercise of dispositive jurisdiction by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 18).

## I. Factual Background

When J.L. was an infant, a pharmacy filled a prescription for him, but labeled the prescribed medication with an incorrect dosage instruction. (Tr. at 209-10).  Consequently, J.L. ingested four times the necessary dosage, suffered an injury, and required emergency medical care.  (Tr. at 210).  In 2000, Allen brought a lawsuit on behalf of J.L. in the Chancery Court of Lowndes County, Mississippi ("the chancery court"), and she settled his claim for $20,000 in 2002.  (Tr. at 209-211) (engagement letter dated 2000).  Pursuant to the court order approving the settlement, after deduction attorney's fees and costs, Allen paid $13,062.73 into

---

[2]      Contrary to the Commissioner's assertion, the court finds that it has jurisdiction to review not only the denial of waiver, but also the Commissioner's determination of the fact and amount of the alleged overpayment.  The February 26, 2015, findings by the ALJ clearly involved not just the question of the claimant's request for waiver of the overpayment, but also the fact and amount.  After the Appeals Council vacated the earlier findings and remanded the matter for further hearing, apparently on all issues, the ALJ undertook to examine once again the fundamental question whether the settlement funds in an account for J.L. should be counted as resources for SSI purposes and, if so, the correct amount of such purported resources.  Indeed, the ALJ himself understood that was what he was doing.  He wrote, "As a result [of the Appeals Council's vacating remanding the earlier determinations], the current proceedings represent a *de novo* hearing on the issues, and the undersigned is not bound by any previous findings made regarding those issues."  The ALJ also considered whether the Commissioner should waive repayment of the alleged overpayment.  Two full pages of the ALJ's written findings dealt with the plaintiff's argument that the funds were not countable as resources because they were in a "special needs" account.  This means that the February 26, 2015 determination is the operative order for review, and it included both the waiver issue *and* the fact and amount of the alleged overpayment.

"an F.D.I.C. insured account." Allen apparently opened a certificate of deposit with Cadence Bank ("the account") and deposited the settlement proceeds. (*See* Tr. at 78-85, 212-13).

Initially, the court order directed Allen to retain the settlement proceeds in the account "for the maintenance and education of the minor child" and prohibited Allen from withdrawing any of the proceeds "without the further order of th[e] Court." (Tr. at 210A; *see also* tr. at 320 (letter from 2002 indicating that proceeds were to be placed in "a frozen account")). According to Allen, the chancery court made clear to her that she "was not to use" the proceeds deposited into the account and that the "money was not to be used for [J.L.] to take care of himself." (Tr. at 333; *see also* tr. at 426-27). On one occasion in 2006, she petitioned the court for authority to withdraw $2,000 from the account because of her and J.L.'s "recent relocation [from Mississippi to Alabama] and [J.L.'s] dire need for medications and counseling not covered by insurance." (Tr. at 285). Because of the move, Allen needed to schedule many doctor's appointments for her son; in essence, she needed to find a new doctor to replace each of his former doctors located in Mississippi. (*See* tr. at 333). Therefore, she needed access to the proceeds to be able to pay for the visits and medications. (*See* tr. at 333). The petition was granted by the Mississippi court.

Allen petitioned the court once again to withdraw proceeds from the account in 2010. (Tr. at 282, 334, 426-27, 435). The chancery court denied her request to purchase a computer for J.L.'s educational needs. (Tr. at 282, 334, 426-27, 435). The chancery court explained to Allen's attorney that it was Allen's responsibility "to take care of [J.L.]" with her own resources, not with the settlement proceeds. (Tr. at 426-27). The court intended the funds in the account to be preserved for payment to J.L. upon his becoming an adult.

From July 2007 to September 2008, Allen was deployed to Iraq, during which time she relinquished her role as J.L.'s representative payee to her mother (J.L.'s grandmother). She was not in control of the account during that time.

## II. Administrative History

Allen, on behalf of J.L., initially applied for SSI benefits on November 10, 2004. (Tr. at 126). Subsequently, on February 28, 2007, an ALJ awarded SSI benefits to J.L. (Tr. at 379). Allen served as J.L.'s representative payee, except for the period of time between July 3, 2007 and September 15, 2008, when Allen was deployed to Iraq. (Tr. at 304, 415). J.L.'s grandmother served as representative payee during the period that Allen served overseas. (Tr. at 304, 415). Once she returned from Iraq and resumed her role as representative payee, the Commissioner began a redetermination of J.L.'s eligibility for SSI benefits. (Tr. at 29). During

this time, Allen first reported to the Commissioner the existence of the account. (Tr. at 34).

On December 9, 2009, the Commissioner informed Allen that J.L.'s payments would stop in January 2010. (Tr. at 40). The Commissioner determined that J.L. should have received no SSI benefits from May 1, 2009 forward because he had resources greater than $2,000 in November 2009 and because Allen's income was greater than the amount of SSI benefits available to J.L. during the period from May 2009 through October 2009 and from December 2009 forward. (Tr. at 40-41, 51-60). The Commissioner determined that J.L. received an overpayment of $5,722.81 for the period from December 2008 to December 2009. (Tr. at 61).

On February 23, 2010, the Commissioner further determined that J.L. impermissibly received SSI benefits for a greater period of time, specifically from December 2007 to December 2009. (Tr. at 71). According to the Commissioner, J.L.'s SSI benefits from December 2007 to April 2009 should have equaled $0.00 because J.L.'s resources exceeded $2,000 based on the settlement proceeds deposited into the account. (Tr. at 78-85). On April 2, 2010, the Commissioner informed Allen that J.L. was not entitled to SSI benefits because his resources exceeded $2,000. (Tr. at 96-97). The Commissioner sent billing statements to Allen in the amount of $7,030 on March 19, 2010 (tr. at 87) and $8,075 on June

14, 2010 (tr. at 107). The Commissioner placed Allen on notice of the total amount of the $15,105 overpayment on April 9, 2010. (Tr. at 98).

At some point, Allen requested the Commissioner to waive the overpayment, and when the Commissioner denied the waiver request, Allen requested the Commissioner to reconsider the waiver request.[3] (*See* tr. at 98). Additionally, on April 7, 2010, Allen requested the Commissioner to reconsider the fact of the overpayment by excluding the account. (Tr. at 101). The Commissioner denied reconsideration for the waiver issue on April 9, 2010 (tr. at 98), and the overpayment issue on April 14, 2010 (tr. at 101). Allen's Mississippi attorney submitted a letter to the Commissioner on April 15, 2010, explaining that, based on Mississippi law, Allen did not have a right to access the account to provide for J.L.'s general support and maintenance. (Tr. at 283). On April 28, 2010, Allen requested a hearing before an administrative law judge ("ALJ"), disagreeing with the Commissioner's initial determinations because the "account was a restrictive account." (Tr. at 106).

Allen twice appeared before an ALJ, once on April 25, 2011 (tr. at 327), and again on September 19, 2011 (tr. at 340). Subsequently, on October 13, 2011, the ALJ notified Allen of his unfavorable decision (tr. at 160), concluding that: (1) J.L.

---

[3] From the transcript, it is unclear to the court when these three events occurred. The Commissioner did request further information from Allen regarding the waiver request on March 17, 2010. (Tr. at 86).

received an overpayment in the amount of $15,105; (2) Allen was at fault; and (3) Allen was not entitled to a waiver (tr. at 165-66). In effect, both Allen and J.L. were liable for repayment. On November 29, 2011, the Commissioner mailed Allen a new billing statement which reflected $15,105 as the total amount due. (Tr. at 290). Allen requested the Appeals Council to review the Hearing Decision on November 30, 2011, asserting that the unfavorable decision "does not agree with the CD transcript of the hearing in which the judge ruled differently." (Tr. at 167). Allen was referring to the hearing held on April 25, 2011, during which the ALJ stated on the record that the account was not a countable resource. (Tr. at 333) (stating "because it's frozen, apparently, it doesn't count as a resource . . . . Somebody counted it as a resource, and . . . I don't really know [why] because the decree is pretty clear on that.").

On August 28, 2018, the Appeals Council vacated the October 13, 2011, hearing decision and remanded the case back to the ALJ "for further proceedings." (Tr. at 186, 188).[4] Allen appeared for a hearing before the ALJ on February 4,

---

[4]    Although the Appeals Council found that "the record shows that the claimant was not eligible for benefits December 2007 through December 2009 due to his mother's income and veteran benefits[,]" substantial evidence does not support this statement. (Tr. at 189). The record contains evidence detailing the alleged amount of income earned by Allen only for the period of December 2008 through October 2009 and December 2009. (Tr. at 61-70). During this period, the Commissioner initially determined that J.L. received an overpayment totaling $5,722.81. (Tr. at 61). The record does not contain any evidence concerning her income from December 2007 through November 2008.
       Furthermore, the issue of income was not determined by the ALJ in his October 13, 2011, hearing decision. (Tr. at 163-166). While the ALJ found that Allen failed to accurately report her income, the ALJ held that the overpayment totaled $15,105 (tr. at 163-66), matching the

2014 (tr. at 355), and requested the ALJ's recusal on March 3, 2014 (tr. at 264), which was granted (*see* tr. at 406).  On July 14, 2014, Allen appeared before a new ALJ.  (Tr. at 403).  Subsequently, on February 26, 2015, Allen again received an unfavorable decision.  (Tr. at 16-18).  The new ALJ held that: (1) J.L. received an overpayment totaling $15,105 because the account was a resource that excluded J.L. from receiving SSI benefits for the period from December 2007 through December 2009; (2) J.L. was liable for the overpayment even though he was not at fault; and (3) Allen was both at fault and liable for the overpayment.  (Tr. at 21-26).  Allen requested review of the ALJ's decision, but the Appeals Council denied review on March 17, 2017.  (Tr. at 5).

---

amount of the purported overpayment due to the existence of the account as a resource for the period of December 2007 through December 2009, not because of Allen's alleged income for the period of December 2008 through October 2009 and December 2009.  (*See* Tr. at 21-22 for further explanation of the "confusion").  Accordingly, because the ALJ neither explained Allen's purportedly inaccurate income reporting nor established an accurate overpayment total based on her purportedly inaccurate income reporting, the ALJ's finding is not based on substantial evidence and is not entitled to any deference.  More fundamentally, the ALJ's hearing decision is not entitled to any weight because it was vacated by the Appeals Council.

On remand, the ALJ acknowledged the initial income determination by the Commissioner in his February 26, 2015, hearing decision, but the ALJ did not make any factual findings about the accuracy of Allen's reported income and whether the reported income resulted in an overpayment.  (Tr. at 19-26).  The ALJ focused exclusively on whether the account counted a resource and whether Allen and J.L. were entitled to a waiver.  Therefore, there has not been a final decision as to whether Allen inaccurately reported her income for the period of December 2008 through October 2009 and December 2009 that resulted in an overpayment of $5,722.81.  The statement made by the Appeals Council in its decision (tr. at 189) is not supported by substantial evidence.

## I. Standard of Review

This Court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

The Court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Mitchell v. Commissioner, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). The Court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner. *Id.* "The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)). Indeed, even if this Court finds that the evidence preponderates

against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. "Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999); *see also Lynch v. Astrue*, 358 F. App'x 83, 87 (11th Cir. 2009) ("Testimony that contains an undue degree of speculation is not substantial evidence."); *Bates v. Colvin*, No. 6:14-cv-906-TMP, 2015 WL 3407539, at *6 n.3 (N.D. Ala. May 27, 2015). No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987). Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## III. Discussion

Allen argues that substantial evidence does not support the ALJ's determination that J.L.'s settlement-proceeds account was an available resource and, therefore, that an overpayment occurred because J.L.'s resources exceeded the $2,000 limit. The Commissioner contends that Allen failed to exhaust administrative remedies by not obtaining a final decision as to the fact and amount of the overpayment. Even if Allen exhausted her administrative remedies as to the

overpayment issue, the Commissioner asserts that substantial evidence supports the ALJ's determination that an overpayment occurred due to the existence of the account. Furthermore, the Commissioner maintains that substantial evidence supports the ALJ's determination that (1) J.L. was without fault; (2) the denial of a waiver does not defeat the purposes or impede the efficient or effective administration of Title XVI of the Social Security Act; (3) the denial of a waiver for J.L. is not against equity and good conscience; and (4) Allen was with fault. The court finds that substantial evidence does not support the ALJ's determination that an overpayment occurred, and because of this fact, the court does not reach the merits of whether substantial evidence supports the ALJ's denials of a waiver for both Allen and J.L.

## A. Exhaustion

Despite the Commissioner's argument to the contrary, Allen has exhausted the administrative procedures related to the overpayment issue. This court may review only the final decisions of the Commissioner. *See* 42 U.S.C. § 405(g). To obtain a final decision, the claimant must undertake a four-step administrative review process. *See* 20 C.F.R. § 416.1400(a). First, the Commissioner must make an initial determination affecting the rights of the claimant. 20 C.F.R. §§ 416.1400(a)(1); 416.1402 (listing actions that are initial determinations). If the claimant is dissatisfied with the Commissioner's initial determination, the claimant

may request the Commissioner to reconsider the initial determination. 20 C.F.R. §§ 416.1400(a)(2); 416.1407. If the request for reconsideration is denied and the claimant is still dissatisfied, the claimant may request a hearing before an ALJ. 20 C.F.R. §§ 416.1400(a)(3); 416.1429. If the claimant is dissatisfied with the ALJ's hearing decision, the claimant may request the Appeals Council to review the hearing decision. 20 C.F.R. §§ 416.1400(a)(4); 416.1467. At this point, the decision of the Appeals Council becomes a final decision when the Appeals Council either denies review or enters a decision. 20 C.F.R. §§ 416.1400(a)(5); 416.1481.

The Commissioner concedes that Allen has obtained a final decision as to the waiver issue, but the Commissioner asserts that Allen has not obtained a final decision as to the fact and amount of alleged overpayment. The Commissioner appears to exalt form over substance. As explained more fully in Section II, the Commissioner terminated J.L.'s SSI benefits starting January 1, 2010, which constitutes an initial decision. (Tr. at 40; *see also* 20 C.F.R. § 416.1402(b)). Allen requested the Commissioner to reconsider the fact and amount of the overpayment on April 7, 2010. (Tr. at 101). After the Commissioner denied reconsideration (tr. at 101), Allen requested a hearing before an ALJ, asserting that the "account was a restrictive account." (Tr. at 106).

Admittedly at this point, tracking the overpayment issue becomes difficult because of the subsequent administrative proceedings, but the Court believes that Allen did not fail to exhaust the overpayment issue. The ALJ made an unfavorable decision on October 13, 2011, finding an overpayment in the amount of $15,105. (Tr. at 165). Allen requested the Appeals Council to review the ALJ's decision, arguing that decision did "not agree with the CD transcript of the hearing in which the judge ruled differently." (Tr. at 167). During a previous hearing, the ALJ stated that the account should not have counted as a resource. (Tr. at 333). The Appeals Council reviewed the ALJ's decision and vacated the decision in its entirety. (Tr. at 186). On remand, a new ALJ issued a hearing decision on February 26, 2015, finding that the account was a countable resource and that an overpayment occurred. (Tr. at 21-23). Then the ALJ determined that Allen and J.L. were not entitled to waivers of the overpayment. (Tr. at 23-26). Allen requested review of February 26, 2015, hearing decision, and the Appeals Council denied review on March 17, 2017, resulting in a final decision. (Tr. at 5).

The Commissioner makes much of the ALJ's framing of the issue on remand. However, it seems clear that when the Appeals Council vacated the earlier ALJ's decision, the entire matter, not just the waiver, was put before the second ALJ. On remand, the ALJ discussed extensively whether the account counted as a resource. The Court finds that the ALJ made a finding as to the fact

and amount of overpayment in response to Allen's original request for reconsideration. Furthermore, even though the Appeals Council's instructions to the ALJ on remand were limited to the waiver issue, Allen adequately raised the overpayment issue when she requested the Appeals Council to review the October 13, 2011, hearing decision. Therefore, Allen received a final decision either when the Appeals Council failed to additionally instruct the ALJ to consider the overpayment issue on remand (indicating that the Appeals Council denied review of the overpayment issue) or when the Appeals Council denied review of the February 26, 2015, hearing decision which extensively discussed the existence of the account. In either circumstance, Allen obtained a final decision as to the overpayment issue.

### B. Merits

#### 1. Regulatory and POMS Framework

The Commissioner and the ALJ determined that J.L.'s bank account was a resource. An individual may not receive SSI benefits if the individual's resources exceed $2,000. 42 U.S.C. § 1382(a)(3)(B). Resources include "cash or other liquid assets or any real or personal property that individual (or spouse, if any) owns and could convert to cash to be used for his or her support and maintenance." 20 C.F.R. § 416.1201(a); *see also* § 416.1208(a). As defined by regulation, "[l]iquid resources are cash or other property which can be converted to cash

within 20 days . . . [such as] stocks, bonds, mutual fund shares, promissory notes, mortgages, life insurance policies, [and] financial institution accounts (including savings, checking, and time deposits, also known as certificates of deposit) . . . ." 20 C.F.R. § 416.1201(b). "An account qualifies as one used for 'support and maintenance' if money from the account may be used for food or shelter." *Shields v. Comm'r of Soc. Sec.*, No. 2:14-cv-226, 2015 WL 9238990, at *2 (W.D. Mich. Dec. 17, 2015) (citing 20 C.F.R. § 416.1157(b)(3)).

Under the Social Security Administration's Program Operations Manual System ("POMS"), a conservatorship account may count as a resource in determining eligibility for SSI benefits. A "'conservatorship account' refers to a financial account in which a person or institution has been appointed by a court to manage and preserve the assets of an individual which are held in the account." POMS SI 01140.215(A)(1).[5] Under the POMS,

> If State law requires that funds in a conservatorship account be made available for the care and maintenance of an individual, [the Social Security Administration] assume[s], *absent evidence to the contrary*, that funds in such an account are available for the individual's support and maintenance and are, therefore, that individual's resource.
>
> A State statute may not specifically address the issue of whether funds in a conservatorship account must be made available for the care and maintenance of the individual. Other State statutes or case law may

---

[5] "Although the POMS is not published in the Federal Register, and does not have the force of law, it is entitled to persuasive authority." *Frerks by Frerks v. Shalala*, 848 F. Supp. 340, 350 (E.D.N.Y. 1994).

> specifically prohibit the use of funds held in the conservatorship
> account for general support of the individual in certain circumstances.
> *Field office (FO) adjudicators should follow regional instructions*
> *regarding availability presumptions that apply in those States*.

POMS SI 01140.215(B)(1) (italics added for emphasis). "Evidence to the contrary" includes, but is not limited to: "restrictive language in the court order that established the account or in a subsequent court order; state or local procedural rules for the withdrawal of funds from the account; and local court practices regarding withdrawal of funds." POMS SI 01140.215(B)(2). However, "the fact that an individual or his or her agent must petition the court for withdrawal of funds does **not** mean that the funds may be assumed to be unavailable for the individual's support and maintenance (and, therefore, not a resource for SSI purposes)[, and a] . . . [d]enial by the court of a request for withdrawal of funds does **not** necessarily mean that funds in the account are unavailable for the individual's support and maintenance." POMS SI 01140.215(B)(3) (emphasis in original).

Admittedly, there is no binding authority and "a dearth of [persuasive] case law" to help determine when funds in a conservatorship account should be counted as a resource. *See White ex rel. Smith v. Apfel*, 167 F.3d 369, 374 (7th Cir. 1999). In *White*, a Missouri minor qualified for SSI benefits in 1990 based on injuries sustained in a car accident. The minor's mother brought a personal injury lawsuit

on his behalf and secured a settlement in December 1991. The settlement proceeds were "placed in a restricted trust pursuant to a court order." *White*, 167 F.3d at 370. The probate court "stressed to [the mother] that she remained primarily responsible for [the minor's] needs, . . . that the trust was to remain untouched until [the minor] reached the age of eighteen[, and] . . . that court approval was required before she did anything with money . . . ." *Id.* Subsequently, in 1995, the mother and minor moved to Illinois. After the mother completed the required forms, the Commissioner determined that the minor was no longer entitled to receive SSI benefits because of the settlement proceeds and that the minor "had not been eligible since January 1992." *Id.* at 371. During the course of administrative proceedings, the mother petitioned the probate court "to release $500 per month for Stanley's support and maintenance, for both current support and support retroactive to the date of the . . . settlement" because she was disabled and unemployed. *Id.* The probate court denied her request. The ALJ found that the settlement proceeds counted as a resource, and the Appeals Council agreed. The district court held that, even though "a court order was required to access the funds[,] . . . the possibility of receiving approval for a reasonable disbursement . . . was enough to uphold the decision of the Appeals Council." *Id.* at 372. The mother appealed.

The Seventh Circuit Court of Appeals reversed, holding that the mother presented sufficient evidence "contradicting the presumption [under Missouri law] that the funds in the conservatorship account [were] available for [the minor's] care." *Id.* at 375. "Once [the mother] rebutted the presumption . . . the onus was on the SSA to show that she still had access to the funds." *Id.* at 376. The Commissioner "failed to adequately counter" the mother's rebuttal of the presumption. *Id.* The court reasoned that the Commissioner's argument rested on speculation: "the probate court might have ruled differently had [the mother] informed the court of the termination of SSI benefits." *Id.* at 375. The probate court's decision to deny the request was within in its sound discretion, and a reviewing court "would have been obliged to affirm." *Id.* After the probate court denied her request, she "no longer had the right, power or authority to liquidate the funds for [the minor's] care and maintenance." *Id.*

In *Shields v. Comm'r of Soc. Sec.*, No. 2:14-cv-226, 2015 WL 9238990 (W.D. Mich. Dec. 17, 2015), a minor sustained injuries during a car accident in 1998, resulting in her disability. As the result of a lawsuit, the minor received a settlement in 2000, with the proceeds deposited into a conservatorship account that could not be accessed by the minor without court approval until she turned eighteen. The minor began receiving SSI benefits approximately 1.5 years after the settlement was approved. However, in 2012, the Commissioner terminated the

minor's SSI benefits because of the account and determined that an overpayment of $17,858.96 occurred.

Over the course of several years, the minor's conservator received court-approved access to the account on multiple occasions to purchase items for the minor. When the minor's home burned in 2003, the minor's conservator petitioned the court for access to the account to purchase the minor new clothes, which the court granted. In 2005, the court likewise granted the conservator's petition to buy the minor additional new clothes after she outgrew the previous clothes. Subsequently, the court approved access for the conservator to purchase the minor a computer and a replacement computer. Finally, the court granted access to the conservator to pay for the minor's driver's education class.

The United States District Court for the Western District of Michigan reversed the decision and remanded the case for further proceedings. *Shields*, 2015 WL 9238990, at *4. The plaintiff argued that, because "the funds in her conservatorship account were not used for her support and maintenance, . . . the account was an excludable resource." *Id.* at *2. The court held that the "question of whether the conservatorship account could be (or was) used for [the minor's] support and maintenance remain[ed] unanswered." *Id.* at *3. The court reasoned that "[t]he ALJ's decision focuse[d] entirely on whether [the minor] had access to the funds within the conservatorship account[, but] . . . the ALJ did not discuss

whether the funds in [the minor's] account were used for her 'support and maintenance.'" *Id.* According to the court, "the ALJ assumed that the funds in the account were used for her 'support and maintenance[,]'" but the evidence in the record did not support such an assumption. *Id.*

Conversely, in *Frerks by Frerks v. Shalala*, 848 F. Supp. 340 (E.D.N.Y. 1994), the minor began receiving SSI benefits in June 1988 because of his mental handicap. Furthermore, his parents, serving as his guardians, could not "dispose of their son's property 'without' further order' of the Surrogate's Court." *Frerks*, 848 F. Supp. at 345. Subsequently, the minor received a settlement in September 1988. His parents deposited the settlement proceeds into four accounts, and the Surrogate's Court explained to Secretary of Health and Human Services ("HHS Secretary") that

> The guardian must apply to the court for an order to withdraw funds. All funds are held in joint control and cannot be withdrawn without a court order. The court will only release funds held in guardianship accounts that the court deems necessary for the support, education and medical needs of the respondent.

*Frerks*, 848 F. Supp. at 345. The parents began to withdraw $700 per month from the settlement proceeds with court approval in July 1990. The HHS Secretary terminated the minor's SSI benefits in March 1990 "because of excess resources[,]" with the termination retroactive to September 1988. *Id.* The ALJ

found that the settlement proceeds were available as a resource, but did not order repayment of the overpayment.

The United States District Court for the Eastern District of New York affirmed, holding that substantial evidence supported the ALJ's decision because "the Surrogate has allowed disbursements of $700 per month . . . to be applied towards Frerks' support and education." *Frerks*, 848 F. Supp. at 349. The court reasoned that, "when determining an individual's SSI eligibility, any assets and other funds readily available to that person for support and maintenance should be applied towards those purposes before the state must intervene to provide minimal financial support to that person." *Id.* The court also found that the HHS Secretary and the ALJ applied the correct legal standards. Finally, the court distinguished *Navarro by Navarro v. Sullivan*, 751 F. Supp. 349 (E.D.N.Y. 1990). According to the court in *Frerks*, the court in *Navarro* found that the settlement proceeds deposited into an account did not count as a resource "because the specific language of the settlement order precluded the availability of the funds for the plaintiff's support and maintenance." *Frerks*, 848 F. Supp. at 351. The language of the order before the court in *Frerks* allowed the parents to use the funds for the minor's support and maintenance. *Id.* Consequently, the minor appealed. The Second Circuit Court of Appeals affirmed, holding that substantial evidence

supported the "ALJ's determination that [the minor] had resources in excess of the statutory limits." *Frerks v. Shalala*, 52 F.3d 412, 414 (2d Cir. 1995).[6]

2. February 26, 2015, Hearing Decision

The ALJ concluded that the settlement proceeds deposited into the account were excess resources that rendered J.L. ineligible for SSI benefits. Specifically, the ALJ held that

**1. The beneficiary, [J.L.], was overpaid Title XVI benefits in the amount of $15,105 during the period from December 2007 through December 2009 (20 CFR 416.537(a)).**

There appears to have been some confusion, regarding the amount of the overpayment. Ms. Allen was initially notified that [J.L.] had been overpaid a total of $5,722.81 for the period from December 2008 through December 2009 because she (Ms. Allen) had not reported all of her income for that period (Exhibit 4). Based on a redetermination that included the additional income, it was determined that [J.L.] should have received $508.17 for December 2008, $545.17 for January and February 2009, $376.84 for March and April 2009, and $0.00 from May 2009 through December 2009-a total of $2352.19 for that period (Exhibit 3). Because he had received $587.00 for December 2008 and $624.00 for January 2009 through December 2009—a total of $8075.00—his overpayment was thought to be the $5,722.81 cited in the January 5, 2010 letter. Ms. Allen requested that the overpayment be waived; however, while the request for waiver was still pending, it was discovered that [J.L.] had an additional bank account that had never been reported. The bank account housed funds awarded as the result of a medical malpractice suit and had been in existence since May 2002–prior to the date of [J.L.'s] SSI application (Exhibit 5). Because those funds (over $13,000 at the time) were well

---

[6] Additionally, at the requests of the minor's parents, the Surrogate created a special needs trust in 1995, but the creation of the trust was not retroactive to the date of the accounts' creation in 1988. *Frerks v. Shalala*, 52 F.3d at 413.

over the SSI program's resource limit, [J.L.] was never eligible [for] SSI payments and was not due the more than $24,000.00 in SSI payments he received (Exhibit 10). However, it was determined at the lower level that administrative finality applied to monies paid prior to December 2007 and that only those payments made from December 2007 forward would be recoverable as an overpayment. [J.L.] had been paid a total of $7030.00 during the period from December 2007 through November 2008 ($573.00 for December 2007 and $587.00 for January 2008 through November 2008). In addition, because he was not due any payments during the period from December 2008 through December 2009, he was overpaid the entire $8075.00 he received for that period rather than the $5,722.81 calculated previously. His total overpayment for the period from December 2007 through December 2009 was $15,105. Any confusion as to the correct amount of the overpayment resulted directly from Ms. Allen's failure to report income and resources timely and correctly.

It is Ms. Allen's contention that the malpractice settlement funds constitute a special needs trust and, as such, should not be counted as a resource. In support of that argument, Counsel has referenced an Amended Decree Authorizing Settlement of Minor's Claim filed on March 26, 2010, in the Chancery Court of Lowndes County Mississippi in which Ms. Allen, as [J.L.'s] guardian, is ordered to deposit the settlement funds "into a trust account with a federally insured institution" where it was "to remain until further order of the Court; once the ward arrives at the age of twenty-one (21) years and the court grants a discharge of the guardianship" (Exhibits 22, 33, 43). In a letter dated April 15, 2010, [J.L.'s] former attorney, Curtis Austin, characterizes the account as a "restrictive account," arguing that state law prohibits Ms. Allen from using the settlement funds "for what would normally constitute the duties of the parent to provide room, board, shelter, clothing, and education" (Exhibits 33, 35). Counsel has also provided evidence that Ms. Allen must petition the court before she can withdraw funds and that not all of her requests have been granted. On October 4, 2006, Ms. Allen was allowed with [sic] withdraw $2000 from the account for her son's "support and care" because she had recently relocated from Mississippi to Alabama and reported that [J.L.] was in "dire need for medications and counseling not covered by insurance" (Exhibit 43). According to a letter dated February 23, 2010, her subsequent request for funds that,

according to her testimony, would have been used to purchase a computer was reportedly denied (Exhibit 43).

As indicated by its title, the March 2010 decree is an amended decree and was established after the overpayments occurred. The decree that was enforceable at the time the SSI payments were made, dated May 31, 2002, specifically states that the funds were to be retained "for the maintenance and education of the minor child" (Exhibit 35). Per CFR 416.1208, funds held in a financial institution account (including savings, checking, and time deposits, also known as certificates of deposit) are considered resources if the individual owns the account and can use the funds for his or her support and maintenance.   Based on information reflected in the Program Operations Manual System (POMS)—a primary source of policy and procedures for SSA-related issues—the account in question was a conservatorship account rather than a special needs trust account. POMS SI 01140.215 defines a conservatorship account as "a financial account in which a person or institution has been appointed by a court to manage and preserve the assets of an individual which are held in the account."  The fact that the court had to be petitioned before funds could be withdrawn or that some requests for funds were denied does not mean that the funds were unavailable for [J.L.'s] support and maintenance.  The language of the decree establishes that the funds were, in fact, for his "maintenance and education."   Thus, the evidence of record establishes that during the months [J.L.] was receiving SSI payments, the funds in the account were available for his care and maintenance and, therefore, his resource for SSI purposes.  As a result, [J.L.] was not eligible for SSI payments at any time through December 2009—the last month for which payments were made—and was overpaid for those months.

Ms. Allen contends that the account was found to be excluded from [J.L.'s] income and resources at both of the previous hearings before an administrative law judge and, further, that a portion of the $15,105 overpayment was waived at one of those hearings (Exhibits 49, 51). She also contends that the Appeals Council agreed that the account should not be counted in its August 28, 2013 Remand Order.  The evidence shows otherwise.  The decision of the administrative law judge who presided over those hearings, dated October 13, 2011, did not find the account to be a non-countable resource and did not waive

recovery of any of the $15,105 overpayment (Exhibit 31). More to the point, Ms. Allen appealed that decision and in the August 2013 order, the Appeals Council vacated the October 13, 2011 decision. As a result, the current proceedings represent a *de novo* hearing on the issues, and the undersigned is not bound by any previous findings made regarding those issues. Her contention regarding the remand order is erroneous as well. That order specifically states that the court ordered trust "does not meet the requirements for the Special Needs Trust exceptions" (Exhibit 34).

(Tr. at 20-23). With the ALJ's determinations in mind, the court turns to whether the ALJ committed an error of law and whether substantial evidence supports the ALJ's decision.

### 3. Error of Law

When the ALJ applied the POMS presumption of availability of the account as a countable resource to terminate J.L.'s SSI benefits,[7] the ALJ either ignored or overlooked clear federal and state legal precedent. Under the POMS regarding conservatorship accounts, if the presumption of availability applies, Allen was tasked to overcome the presumption by submitting "evidence to the contrary." POMS SI 01140.215(B)(1); *see also White*, 167 F.3d at 376. Only when Allen successfully rebutted the presumption of availability was the ALJ required to

---

[7]    Admittedly, based upon the ALJ's February 26, 2015, decision (tr. at 21-23), it is not clear to the court whether the ALJ determined that the presumption of availability under POMS SI 01140.215(B)(1) applied. The Commissioner suggests that the ALJ did determine that the presumption applied. *See* Doc. 15, pp. 15-17. Based on the Commissioner's representations to this court, the court concludes that the ALJ determined that the presumption applied, but he failed to consider whether the presumption was rebutted by "evidence to the contrary." POMS SI 01140.215(B)(1).

counter the rebuttal. *White*, 167 F.3d at 376. Allen attempted to rebut the presumption, in part, by pointing to the highly restrictive way local Mississippi law treated such accounts.

Before applying the presumption of availability, the ALJ should have referred to state law. The relevant POMS specifically directs the Commissioner to consider local law when assessing the availability funds in such an account. Social Security adjudicators must take into account that "State statutes or case law may specifically prohibit the use of funds held in the conservatorship account for general support of the individual in certain circumstances." POMS SI 01140.215(B)(1). Under longstanding Mississippi law, access to funds set aside for a minor are severely restricted by the court practice and by statute. A court may appoint a guardian for a minor and that "guardian is the legally recognized custodian of the person [and] property of [the minor] with prescribed fiduciary duties and responsibilities under court authority and direction." *Harvey v. Meador*, 459 So. 2d 288, 291 (Miss. 1984). The Mississippi Supreme Court succinctly described the fiduciary relationship between a guardian and her ward:

> A minor under guardianship is a ward of the Chancery Court. All receipts and disbursements of his estate are required to be under the authority and direction of the Chancery Court . . . The object of the law is to guard against dishonesty and mismanagement of the estate by the guardian. . . . The law does not leave the amount of the expenditures by the guardian for the maintenance, support and education to his discretion. "The sum must be fixed by the court." If

the guardian contracts therefor without the sanction of the Chancery Court . . . , the liability therefor is personal to him, and he cannot be allowed for it in his accounts for the ward. The guardian has no power to bind the estate of his ward without the sanction of the Chancery Court . . . .

*Welch v. Childers*, 195 Miss. 415, 15 So. 2d 690, 691 (1943). A guardian has a duty "to improve the estate committed to his charge, and to apply so much of the income, profit or body thereof as may be necessary for the comfortable maintenance and support of the ward . . . after obtaining an order of the court fixing the amount." Miss. Code Ann. § 93-13-38; *see also Matter of Atkins' Estate*, 422 So. 2d 754, 757 (Miss. 1982) ("This corresponds with the duty of a guardian as it has existed for a long time."). Specifically, "[t]he chancery court . . . may, at discretion, settle the sum to be expended in the maintenance and education of a ward, having regard to his or her station, future prospects and destination." Miss. Code Ann. § 93-13-35. However, "[n]o guardian shall make any expenditure in excess of his ward's income for the ward's support and education without a previous court order of the court . . . ." Miss. Code Ann. § 93-13-35.[8]

---

[8] Importantly, the Commissioner agrees with this longstanding Mississippi precedent. Under POMS SI ATL01140.215,

Based on Mississippi law, do not assume the funds in a conservatorship account are available for the support and maintenance of the SSI claimant or recipient. Review the court order establishing the conservatorship and any subsequent court orders concerning the authority of the conservator to use the funds of the SSI claimant or recipient. The review should determine if the funds in conservatorship

Because Mississippi statutes and case law do not affirmatively mandate "that funds in a conservatorship account be made available for the care and maintenance of an individual," *see* Miss. Code. Ann. §§ 93-13-35 and -38,[9] the POMS required the ALJ to "follow regional instructions regarding availability presumptions that apply in those States." POMS SI 01140.215(B)(1). In other words, the ALJ could not have applied the presumption of availability unless a regional instruction required otherwise. In the absence of such a regional instruction,[10] the ALJ should not have applied the presumption of availability, but collected evidence as necessary to make a "determination as to whether the funds in the [conservatorship] account are a resource for SSI purposes." POMS SI 01140.215(C)(1)-(4). Essentially, the POMS precluded application of the presumption of availability without clear direction from a Mississippi statute or a

---

account is available for support and maintenance of the SSI claimant or recipient, and is a countable resource.

Although recently enacted in September 2017, POMS SI ATL01140.215 embodies the state of Mississippi guardianship law as it has existed for many decades.

[9] Although Mississippi law appears to suggest that a court may require a guardian to use the account's funds for the minor's maintenance and education, the statutes do not compel this result in every situation. Indeed, the statute equally allows the chancery court to prohibit the use of the ward's funds for maintenance and support. In this light, it is clear that the presumption of availability simply does not apply to such accounts in Mississippi. Each must be individually considered, based on the evidence regarding the creation and administration of the account.

[10] It appears that a regional instruction is guidance promulgated by the Social Security Administration in the form of POMS to assist field office adjudicators in determining whether a conservatorship account is available under the relevant state's law. *See, e.g.*, POMS SI ATL01140.215.

regional instruction. It was a legal error to use the presumption to make that determination in this case.

Nothing in the record demonstrates that the ALJ consulted Mississippi law to determine whether a conservatorship account can be presumed available as a resource. Therefore, the ALJ applied the presumption of availability in contravention of the POMS. Application of the presumption here allowed the ALJ to shift the burden of proof to Allen, and the ALJ's determination that the account was a resource is based Allen's purported failure to rebut the presumption. The ALJ did not adequately determine the availability of the account as a resource because he impermissibly applied the presumption and did not undertake his own required factual analysis regarding the resource's availability to pay for J.L.'s maintenance and support.

Additionally, the ALJ failed to follow POMS SI 01140.215(C)(1)-(4), which failure constitutes a legal error requiring reversal. After recognizing that the chancery court denied Allen's request to purchase J.L. a computer with funds from the account, the ALJ failed to cite evidence from the chancery court explaining its reasons for doing so. The ALJ needed to know whether the chancery court denied the request because Allen sought access to the account in order to purchase a non-essential item, or because the purpose of the account was to preserve the funds

until J.L. obtained adulthood. Without that evidence, the ALJ could only make the unwarranted assumption that the request was for a non-essential.

On remand, the ALJ must determine whether the account was a resource and whether Allen requested to purchase a non-essential item (namely, the computer). The ALJ cannot rely on the presumption of availability contained in the POMS or assume that Allen requested to purchase a non-essential item.

### 4. Lack of Substantial Evidence

Assuming *arguendo* that, correctly, the ALJ did not apply the presumption that the funds in the account were available for J.L.'s maintenance and support, but actually determined that the account was a resource that could be used for J.L.'s support and maintenance, substantial evidence does not support that determination. As discussed previously, in the absence of a regional instruction, the ALJ should have collected evidence as necessary to make a "determination as to whether the funds in the [conservatorship] account are a resource for SSI purposes." POMS SI 01140.215(C)(1)-(4); *see also* 20 C.F.R. § 416.1208. A reasonable person could not accept the 2002 court order relied upon by the ALJ as "adequate to support" the ALJ's determination that the account was an available resource when analyzed in light of Allen's allegations and the other evidence in the record. In other words, based on the 2002 court order, the ALJ assumed that the account could be used for J.L.'s maintenance and support; that assumption is not supported by the substantial

evidence in the record. The ALJ based his decision on two faulty assumptions: (1) that the account was an available resource and (2) that the proceeds in the account were used for J.L's support and maintenance. As discussed previously, assumptions and speculation do not establish substantial evidence. *See White*, 167 F.3d at 375-76; *Shields*, 2015 WL 9238990, *3-4.

First, the ALJ made the faulty assumption that the settlement proceeds in the account "were available for his [support] and maintenance" based on the 2002 Decree Authorizing Settlement of Minor's Claim ("2002 decree"). (Tr. at 23). The ALJ asserted that "[t]he fact that the court had to be petitioned before funds could be withdrawn or that some requests for funds were denied does not mean that the funds were unavailable for [J.L.'s] support and maintenance." (Tr. at 22-23).

In making this assumption, the ALJ wrongly concluded that the 2002 decree was the only operative decree to determine whether the account was a resource, failing to consider the effect of the 2010 Amended Decree Authorizing Settlement of Minor's Claim ("2010 decree"). Although the 2002 decree asserted that the "remaining proceeds . . . be retained by [Allen] for the maintenance and education of [J.L.]" (tr. at 210A), the 2010 decree omitted this statement (tr. at 324), and instead declared that the proceeds "are to remain until further order of the Court [or,] once the ward arrives at the age of twenty-one (21) years[,] . . . the Court

grants a discharge of the guardianship." (Tr. at 324). Even though the 2010 decree was entered after the Commissioner terminated J.L.'s SSI benefits, nothing in the order suggests that the amended decree did not apply retrospectively or that it did not reflect the actual manner in which the account was administered. In fact, the 2010 decree contained virtually the same granting language as the 2002 decree; both orders required Allen to accept the settlement proceeds from Fireman's Fund less expenses and attorney's fees. (See tr. at 210A, 324). If the 2010 decree did not apply retroactively, the chancery court did not need to include virtually the same granting language as the 2002 decree because Allen had already accepted payment of the proceeds from the Fireman's Fund less expenses and attorney's fees. Therefore, the 2010 decree was not simply a prospective amendment of the existing 2002 degree; it was intended by the chancery court to more accurately embody the chancery court's and Allen's understanding of the restricted nature of the account. (*See* tr. at 333, 426-27). Indeed, the Mississippi attorney's letter to the ALJ (Tr. at 283) makes this point—the account was always intended to preserve the funds for J.L's adulthood and not as a resource for his maintenance and support as a minor. Likewise, the chancery court's miserly handling of requests by Allen to access the funds is evidence that it was *not* intended or allowed by the court to be used as a resource for J.L.'s ordinary maintenance and support. The court allowed access to the funds only in the most dire circumstances

of J.L's need for medical treatment. All of this evidence established that, notwithstanding the contrary language of the 2002 degree, neither court nor Allen understood the funds in the account to be available for the ordinary maintenance and support of J.L.

At this point, the court finds it helpful to distinguish *Frerks* on the facts. Although the court order in *Frerks* is very similar to the 2002 decree here, the court in *Frerks permitted* the minor's parents to withdraw regularly $700 per month from the "accounts to pay for the support and education of" the minor. *Frerks*, 848 F. Supp. at 345. Unlike the facts in the instant case, the court in *Frerks* did *not* intend to restrict access to the minor's account for purposes of support and maintenance. Here, by contract, the chancery court granted Allen's one-time request to withdraw $2,000 to pay emergency medical expenses, but denied a subsequent request to purchase a computer. The access to the accounts and the use of the funds in *Frerks* was materially different from the potential access to the account and the use of the funds here. In *Frerks*, the language of the order creating the accounts and the language of the order granting the parents the authority to withdraw $700 per month establish that the accounts were intended by the court to be available as a resource for the minor's support and maintenance. While the 2002 decree contained similar language to the order in *Frerks*, the chancery court's actual supervision of the account and its subsequent amendment

of the 2002 decree to establish explicitly the account's restrictions are powerful and substantial evidence of the original understanding of the restricted nature of the funds at the time of the creation of the account in 2002.

Furthermore, Mississippi statutory and case law strongly indicate that the proceeds were not available for J.L.'s support and maintenance. As previously discussed, under Mississippi law, the chancery court has complete discretion to deny a very reasonable request for access to the settlement proceeds. *See Welch*, 195 Miss. 415, 15 So. 2d at 691. The ALJ could easily have consulted Mississippi law to discover that access to the account was severely restricted. Importantly, Allen's Mississippi attorney submitted a letter to the SSA in 2010, which indicated that

> In the state of Mississippi, a child under the age of 21 years old cannot access funds, until the child is 21 years of age. The guardian or natural parents cannot use these funds to supplement their income or otherwise use the funds for what would normally constitute the duties of the parent to provide room, board, shelter, clothing, and education.

(Tr. at 283). This letter corroborates the perception of Mississippi law as it relates to a court's restrictive control of an account maintained by a guardian on behalf of a minor, and it supports the conclusion that the 2010 decree applied retroactively as a clarification of the actual restrictions on J.L's account. Therefore, this letter undercuts the ALJ's speculation that the chancery court would have granted

Allen's reasonable request; in fact, this letter indicates the opposite result would have occurred.

To find the account available as a resource required the ALJ to speculate as to whether the chancery court would have granted an additional reasonable request. *See White*, 167 F.3d at 375-76. For the same reasons the court in *White* did not speculate as to the probate court's possible alternative actions, this court cannot speculate as to whether the chancery court would have granted Allen's reasonable request to access the proceeds for J.L.'s support and maintenance. In *White*, the probate court admonished that the parent "remained primarily responsible for [the minor's] needs, [and] . . . that the trust was to remain untouched until [the minor] reached the age of eighteen. . . ." *White*, 167 at 370. Here, the chancery court similarly admonished Allen and amended the decree to prohibit access to the account until J.L. reaches the age of twenty-one. While the ALJ may have believed that the chancery court would have granted Allen's reasonable requests for support money, the ALJ could only have speculated about the chancery court's actions based on the language of the 2002 decree and the previous grant of limited access in 2006. As announced in *White*, speculation does equal substantial evidence. *See White*, 167 F.3d at 375-76. The ALJ should not have speculated in this manner given Mississippi law as it relates to guardian access to a minor's funds and the entry of the 2010 decree.

Even with these restrictions in place by the chancery court, the ALJ wrongly assumed that the account was available based on the chancery court's previous order granting Allen access to the account for emergency medical treatment for J.L. In 2006, the chancery court granted Allen access to the settlement proceeds to help pay for relocation expenses and J.L.'s emergency medical expenses. This grant is the only time that the chancery court permitted Allen to access the account. In fact, the chancery court subsequently denied Allen's request to purchase a computer for J.L.'s education and subsequently amended the original settlement decree in 2010 in response to make plain what it had intended all along—that the funds were to be preserved for J.L. until his adulthood. In conjunction, these two facts indicate that Allen did not have access to the settlement proceeds for J.L.'s support and maintenance.

Like the probate court's denial in *White*, the chancery court here denied Allen's last request for access to the account. Because Allen has requested authority to access the account only twice, the court's denial of her second request is significant. In *White*, the probate court's denial stripped the plaintiff of "the right, power or authority to liquidate the funds for [her son's] care and maintenance." *White*, 167 F.3d 376. Similarly, Allen did not have a right to liquidate the account for J.L.'s support and maintenance without the court's prior approval. Even though the court previously granted her access to the account, the

court granted her access because of an emergency unlikely to repeat itself. This fact does not negate the inference that Allen did not have a right to access the account for ordinary support and maintenance, given the court's subsequent denial of Allen's second and last request. The ALJ did not possess any evidence on which to base a finding that the chancery court would have granted a third or any future requests after the court denied the second request and entered the amended decree in 2010. The second denial indicated that the court sought to enforce its restrictive control of the account, and importantly, the court entered the amended decree in 2010 to reflect its restrictive control of the account. Thus, the ALJ impermissibly speculated that the account was an available resource based on the chancery court's first and only grant of access.

Second, the ALJ based his decision on the faulty assumption that the proceeds withdrawn from the account in 2006 were used for J.L.'s "support and care." (Tr. at 22). Specifically, the court granted Allen access to the account in 2006 so that she could pay for J.L.'s emergency medical expenses.[11] In *Shields*, the court remanded the case to the ALJ because "the ALJ assumed that the funds in the account were used for [the minor's] 'support and maintenance' since money from the account was spent on clothes, computers, and a driver's education class."

---

[11] To be clear, Allen and J.L. moved to Alabama in 2006, and it became necessary to locate new doctors for J.L. in Alabama. Because health insurance would not cover these initial consultations, Allen need money to contact and set up J.L. as a patient of doctors needed to treat J.L.'s disability in Alabama.

*Shields*, 2015 WL 9238990, at *3.   The court found it problematic that "there [was] no evidence in the record to support the ALJ's assumption that such items constitute 'support and maintenance.'"  *Id.*

Here, the same concern as in *Shields* rings true.  The ALJ has impermissibly assumed that the funds were used for J.L.'s support and maintenance.  In fact, while the ALJ recognized that the chancery court granted access to the account in 2006 because of J.L's relocation and emergency medical expenses, the ALJ unfairly focused on the relocation aspect to determine that the proceeds were used for J.L.'s "support and care."  (*See* tr. at 22).  Because of the relocation, Allen did not have insurance in place to cover the costs of the medications and counseling that J.L. needed. The funds were not used for ordinary relocation expenses, but for medical expenses caused by the relocation.  It is unlikely and speculative that Allen will move again and be in the same situation.  So the use of the funds to pay for J.L.'s emergency medical expenses do not indicate that the funds were available for J.L.'s ordinary support and maintenance; the funds were used to pay for his emergency medical expenses, not for food, clothing, or shelter.  *See* POMS SI 01140.215(D)(2).[12]

---

[12]      Notably, the chancery court denied access to the settlement proceeds to purchase a computer, an item that arguably can be considered necessary for J.L.'s support and maintenance. Even then, a computer is not food, clothing, or shelter, which are items that qualify as support and maintenance. *See* POMS SI 01140.215(D)(2); *see also Shields*, 2015 WL 9238990, at *2.
       The Commissioner argues that, despite a court's denial to access the funds, an account may still be considered a resource if the court denied a request for a "non-essential" item. (*See*

Therefore, the court believes that the account was not an available resource as defined by 20 C.F.R. § 416.1208 and POMS SI 01140.215, because the proceeds could not be used for J.L.'s support and maintenance. The ALJ's determination that the account is a resource and that account was used for J.L.'s "support and care" (tr. at 22) is not supported by substantial evidence. The ALJ unreasonably relied on the 2002 decree alone while ignoring or giving little weight to the rest of the evidence indicating that the chancery court *always* intended the funds to be preserved and not used for ordinary support. A reasonable person would not accept the 2002 decree (and the inferences that flowed from it) "as adequate to support [the ALJ's] conclusion." *Mitchell*, 771 F.3d at 782. In effect, because the ALJ misplaced reliance on the 2002 decree, the ALJ impermissibly speculated as to the account's availability and assumed that the withdrawn proceeds were actually used for J.L.'s support and maintenance. Because, as discussed above, the presumption of availability did not apply to this account in the unique circumstances of Mississippi law, the ALJ and the Commissioner had the burden of establishing that the account was available for J.L.'s support and

doc. 15, pp. 16-17; POMS SI 01140.215(B)(3)). The Commissioner appears to assume that the chancery court denied Allen's request for access to the settlement proceeds because a computer is a non-essential item. However, the record does not indicate why the chancery court denied Allen's request. Even in 2009 or 2010, when the denial occurred, it is difficult for the court to conclude that a computer is a non-essential item for a child's education. In any event, the court gives little weight to this argument. It is equally likely that the court denied the request because the funds were *not* intended for even essential support, but were to be preserved until J.L. reached adulthood. The crucial point is that the ALJ had no substantial evidence on which to reach the conclusion he did.

maintenance. The record does not contain substantial evidence to make that determination. In fact, because of the very nature of Mississippi law, the ALJ and the Commissioner have a high burden in establishing that the account was an available resource. On remand, the ALJ cannot speculate as to the account's availability, but instead must identify substantial evidence that demonstrates that the account is available, if possible.

## IV. Conclusion

Upon review of the administrative record, and considering all of Allen's arguments, the court finds that the Commissioner's decision is not supported by substantial evidence and, therefore, is due to be remanded for further proceedings not inconsistent with this opinion to determine (1) whether an overpayment occurred and (2) if an overpayment did occur, the amount of the overpayment.[13] A separate order will be entered.

DONE this 10th day of August, 2018.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE

---

[13] Additionally, the court concludes that substantial evidence does not support the resource determination for November 2009. The Commissioner did not adhere to 42 U.S.C. § 1382b, which requires the Commissioner to exclude one automobile in determining an individual's amount of resources. In November 2009, the Commissioner counted two vehicles as resources in error. Only one vehicle should have been counted. 42 U.S.C. § 1382b(a)(2)(A). Therefore, the Commissioner did not correctly calculate J.L.'s ineligibility in November 2009.